Alright, the State Board of Land Registration Comm'n is now in session. I'm going to just leave you over to the sidelines. Yes? Where is he?  Is he coming? He might as well sit down. Thank you. Will the clerk please call the first case of the morning? Counsel, you may proceed. Good morning. Good morning. Thank you in advance for considering this matter. So, Trevor, my client, worked in construction his entire life. And at some point he started to work for TJ's Maintenance and Remodeling, the defendants here. He worked with his hands. As he testified, he performed physical labor. That is what he did on a daily basis. Around 2012, he noticed that his hands started to tingle and go numb when he would hammer. His feet would go numb when he would kneel and pull out plywood. And he would just shake it off and continue to work. But he decided to make an appointment to see a medical doctor to find out why his hands would go numb and tingle while he would hammer and why his feet would also become numb and tingle while he would kneel and pull out the plywood while he would work. And so he had an appointment for June 6, 2013 to see a doctor about why this was happening to him. In the meantime, he continued his physical labor. He testified that he had various jobs because he worked for a small construction company. And so they sent him. He would go to where he was sent to. It's a family-owned construction. I'm sorry, what? Family. No, actually, as my client testified, he had absolutely no ownership interest at all. Okay, but his brother and sister did? No, his sister didn't have any ownership. The brother was a sole shareholder. Okay. And so Trevor was an employee, no ownership interest at all whatsoever. He made that very, very clear when he testified. Okay. And he did, as I said, he did manual physical labor. So he testified that, you know, he said, for instance, that he testified as to some of the jobs that happened before the acute incident, such as hanging like a monkey on rafters to put in vents, installing steel cage doors and taking them out at the diner site, all physical heavy labor. On June 3rd, 2013, three days before his doctor's appointment, he starts his job at about 530 in the morning. He goes, he gets the supplies, he puts them in, and it's a complete tear-off of a roof and replacement of a roof. That's the job for the day. So he gets to the job site, and he is, as he testifies, he has to use a lot of muscle force, like a lot of arm strength, to pull out the nails, using pry bars and other sorts of tools to pull out the nails from the shingles on this roof. He does this for six hours straight, and then while he is walking down a ladder with 60 pounds of shingles on his neck, when the ladder goes from two rungs to one rung, he loses his footing. He instinctively grabs on with his left arm to stop himself from falling. As soon as he does it, he feels excruciating pain that goes down his arm, into his neck, down the left side of his body, into his back, and he feels excruciating pain. And this is, again, after six hours of repetitive, hard labor. He goes into the car. He takes in a lead. He tries to get better. He calls the office manager. Well, is the company contesting that there was this incident? Nobody's contesting that, are they? Well, they were. Yes, initially, they were. Initially, they were. But now, that's not an issue. It's a causal connection. I mean, nobody's saying that he made this injury up, are they? Not at this level, because this part was not on appeal. We were successful in trial. But that actually was an issue at trial. Is it an issue now, though? No, it's no longer an issue now. But I think it's a big issue. And actually, it is an issue, because the neck is an issue. So, yes, it is. Because we do allege that he hurt his neck as part of this incident. We allege that he hurt his shoulder, his neck, and his back as a result of this acute incident. And how many claims did he file? We ended up filing a total of three claims. We filed the initial claim, which included the neck, all the body parts that we allege were injured. The neck, the back, the fingers, the feet, the hands. We filed everything. But then as the litigation went on, I received a report from a doctor that said some of this could have been over time. And then to protect him, you'll see a year later, I filed two additional claims. But our initial claim was for all these incidents because we believe that this accident date of June 3rd, 2013, he did suffer injuries to all of these body parts on that date. So that was the initial claim. Can I ask you a question? Yes. You've got Dr. Bernstein, Dr. Vendor, and Dr. Ciattia opining no causal connection. You've got your doctor, Dr. McNally. Pardon me? First of all, Dr. Ciattia is Trevor's treating physician. Yes. Dr. McNally, both the treating physicians, and they both opine causal connection. Dr. Ciattia opined that the July 25th, 2013 MRI of the cervical neck showed degenerative changes that could not be necessarily caused by the June 3rd, 2013 work accident or repetitive activities. That's what he said. Dr. L.V. Bernstein said that the neuropathy would not be related to his work injury and was not related to his carpal tunnel surgery. And then we've got Dr. Vendor. Pardon me, that was Dr. Vendor. Dr. Bernstein said that claiming that he suffered strains of the cervical and lumbar spine as a result of the work accident, claiming he had no permanent injury to either neck or low back, recommended conditioning. Now, McNally says that any type of construction work could exacerbate symptoms of carpal tunnel, but he wasn't aware of the claimant's job-related activities, according to him, and he merely said that it was possible that the claimant's shoulder and neck symptoms could have been, could have manifested the injury, and his opinion that the claimant's cervical neck condition was causally related. So you've got doctors saying no. You've got a doctor saying yes. Now, tell me why the commission couldn't rely on doctors other than McNally. Well, first of all, that's not the reading of the medical, okay, because you're taking different parts at different times. First of all, Dr. Bernstein did causally relate the back and the neck to the accident. What he basically said is by the time Trevor saw him a year later, it got better. But that doesn't mean that on June 3rd, when he incurred medical bills and he saw Dr. McNally, Dr. McNally said, get an MRI, let's see what's wrong with your back, and let's go on for physical therapy, that he didn't suffer an accident on June 3rd, just because when Dr. Bernstein sees him a year later, after Trevor wasn't working for a year, his back got better doesn't mean he didn't injure it on June 3rd. We understand that. Let's slow down. Slow down, please, ma'am. It means that Dr. Bernstein said that as of his examination, there is no causal connection between the man's condition and his work injury. That is his condition on the day Dr. Bernstein saw him. He doesn't say there's no causal connection. He said he suffered strains and sprains. He said he suffered strains. It's nature and extent. So he doesn't give you nature and extent. What about Dr. Chiatia? Dr. Chiatia does specifically say that as a result of a double-crush injury, which happened on June 3rd, that in fact he could have injured his neck on June 3rd. And actually as a result of Dr. Chiatia's opinion, which was a very, very lengthy opinion, that is the only reason why I filed an additional application on July 25th. Sorry, that alleged accident date of the DMV MRI. I found it here. It was only because Dr. Chiatia made that opinion as part of his narrative report. I really think it happened on June 3rd when this whole thing happened. He felt immediate pain in his neck. And Dr. McNally said, as you saw, that the neck is connected to the shoulder and that he hurt his neck on June 3rd. But because Dr. Chiatia made multiple opinions with regard to how the neck could have been injured as a result of work, I mean, they all say it was because of work. But because Dr. Chiatia made multiple, I guess, theories, that's the only reason actually why I filed that third application with regard to the neck. Otherwise I would not have filed that third application, but I wanted to protect Trevor. And the event that the arbitrator found, you know, it didn't happen on June 3rd, but, yeah, the manifestation date was on the day of the MRI. Obviously you have a different interpretation of the medical evidence that he alluded to, but is it your opinion, candidly, that there's no evidence in the record to support the commission's decision? Is that what you're telling us? Well, what I'm telling you is that there are different – what I wrote in my brief, which I truly believe, is that there are different standards of review that apply in this case. And I listened in preparation for today the arguments in the Maddox-Zuko – I don't know if I'm pronouncing that correctly – case, in which this Court even says, under those oral arguments, that a de novo review applies if the wrong law is applied to the facts in the case. And I believe that part of the analysis in this case, the wrong law was applied. And that specifically would be what? What wrong law was applied? So, first of all, the de novo review, I believe, should be applied to Trevor's neck from the first application, because I did file an application that alleged his neck, and there was no finding at all – the commission was silent – as to Trevor injuring his neck on June 3rd. And, therefore, I'm at a disadvantage, because when I'm asking this Court to reverse the decision, I can't even argue about the neck, an error made with regard to the neck on the first application, because it's not even mentioned. The commission doesn't make any findings with regard to Trevor's neck as of the June 3rd incident, which I think is what caused his neck injuries. Dr. Chaya testified the neck and the shoulder are connected. I think he hurt his neck on June 3rd. At least, what he said, I hurt my neck. And also, Dr. Bernstein, their I.D., says he strained his neck. So I think there was clearly an accident on June 3rd. But I can't even address that, because the commission is silent. It doesn't give any finding with regard to the neck. So I think that's a de novo review. I believe it's a de novo review based on the facts. Wait a minute. De novo review is basically where the facts are undisputed. You're saying that if the commission doesn't address a specific issue, it turns the whole thing into a de novo review? Because it doesn't follow the statute. According to the statute. Do you have case law to support that argument specifically? Case law you can cite to us to say it metamorphosizes into a de novo review when they don't touch on a certain argument. And they don't follow the law, because there is a statute that I – first of all, I cite the statute, which requires a de novo review. That could be correct. I'm just asking, do you have any cases you can call our attention to? Yes. And I do cite those cases in my brief. The Illinois Consolidated Telephone v. Industrial Commission case and Ingrassia Interior – And they stand for what proposition specifically? That when an issue turns on the construction of a statute of question of law arises which the court refused to note – How does the issue turn on a question of construction? You're talking about medical evidence here. No, I'm talking about statutory construction. Because under the statute, the commission is supposed to make findings of fact and conclusions of law on each contested issue. And that was a contested issue, and the commission failed to make a finding with regard to Trevor's neck. And that is a question of law. Should they make a finding with regard to Trevor's neck? The statute requires them to make a finding, and they didn't make a finding. That is a question of law, because that involves an interpretation of a statute. Now, with regard to the repetitive trauma aspects that I brought forth, that's why I – In a way, I wish I would have listened to the oral arguments in Madison before I wrote my brief, because I would have argued completely a de novo review with regard to all of the repetitive trauma elements in this case, because the commission applied the wrong law to the facts. And my understanding, which is – What wrong laws did they apply? The wrong laws the commission applied is that one is required for a repetitive trauma injury to show force, duration, frequency. I mean, these are elements that someone can look to when they're reviewing a case. It's fact-specific, I think, to each case. It is what happened to this person. But there is no case. I didn't find one case that says these are the elements someone has to prove in the case. Okay? That's one thing. Another aspect that I feel was the wrong law is that – I mean, your position is that the claimant in a repetitive trauma case doesn't have to prove that he was engaged in a repetitive activity? That's not – well, no, that's not what I'm saying. What are you saying? What I'm saying is that the specifics – that you have to show these elements. You have to show force. You have to show duration. You have to show frequency when using vibratory tools. That I could not find. One case saying this is what the court requires. This is what the law requires. You have to show each and every one of these elements. The fact that the commission said that the treating physician must express an understanding of specific aspects – and this is the language that the commission uses – specific aspects of a petitioner's work in order for that doctor to appoint his causation, I can't find one case that says the doctor has to have specific understanding, as opposed to just a general understanding if the person worked in construction. And that's what the cases have shown. So what does the commission hold, then, in your opinion on that issue? The commission held, first of all, that Trevor's doctors didn't have an understanding as to the kind of work that he did, so therefore they were not in a position to offer causal connection opinions, which I think flies in the face of the case law. Wait a minute. The doctors don't know anything about the job duties and the repetitive nature. How can they give any opinion? But that's not what I'm saying. The doctors did understand. The doctors understood that he didn't work in a sedentary job as a secretary on a computer, that he worked hard labor. In fact, Dr. Pachadi said he worked in awkward positions and he had to lift heavy loads. I think you're blending some different arguments and you're going a little fast. Let me ask you this. You said you could find no case on elements. Maybe you address this in the course of your argument. Sure. The Williams v. Industrial Commission case, 244, Illinois Appellate Dirt 204 says, in order to prevail under repetitive promise theory, which is what you've set forth, a claimant must establish that his work duties were sufficiently repetitive in nature, occurrence, and force so as to cause a gradual breakdown of the claimant's physical condition. And doesn't that set forth the law on repetitive trauma? It does, and we established that element here. But in the Williams case, the facts in that case were the person was drunk, he had diabetes, and the doctors were inconsistent in their opinion. So in repetitive trauma, you have to look at the facts in each case. And those were the facts in that case. And here we do show that there was force that was used. There was duration. But we don't have specifics in terms of how many times he hammered. And that's what it seems like what the commission was showing, is that unless you work in a factory and on a specific machine every day and counting how many times you do a certain task, it seems to me from my reading of the commission's decision that's what one needs to show, and that the doctor has to have intricate knowledge. No, it's a question of degree. It says it has to be sufficiently repetitive in nature. That would indicate how many times is this person performing this job. That's the meaning of sufficiently repetitive. If you're saying that a person has a general job and he does this most of the day, what would that mean? Ten times, 50 times? Repetitive means what it is. Repetitive. Which we showed in this case. Because if you look at what happened in the factory. You did show it. You're saying the commission said what? Well, the commission said his job was supervisory and it ignored all those facts. What did the doctor say? What? What did the doctor say about the repetitive nature? Did they know anything about the repetitive nature? Yes. I believe they did. And that's what Dr. Chatty says. He says he's working, you know, repetitively, doing hard labor. Except for one problem. Chatty admitted that he had absolutely no understanding of what the man's job duties were. No, that was McNally. That's not what Dr. Chatty said. What did Chatty say? What Dr. McNally said is I understand he works in construction, that he generally works in construction. Well, would that, in your opinion, be sufficient? If somebody's working in construction, does that delineate the repetitive nature of the job? It could be a number of different jobs. Well, did that tie together with Trevor's testimony that he hammers for, you know, three hours straight after he has a bump shoulder and he's working, he's hammering repetitively with one arm for three hours, and that for six hours before that he's pulling out, you know, the nails from shingles, that that shows repetitive ties to the doctor who says he works in construction. That could be sufficient. I mean, as we know, the claimant's testimony alone could be sufficient to carry the day very candidly, unless there is contrary evidence and the commission saying Bernstein's opinion is contrary evidence. No, that's not what the commission is saying, because, first of all, Bernstein was the iron near the back of the neck. He has nothing to do with repetitive trauma. What the commission said was although the claimant testified that he used vibratory tools and other hand tools, there was no evidence as to the frequency, duration, or force required in using those tools. And they observed that his job duties were supervisory in nature and seemed to be very minimal as to the repetitive activities. And that is flat out wrong, and that's contrary to Trevor's testimony, which is unconverted, and I brought in the Darling case to show that when the testimony is unconverted, that's also a problematic case. Unconverted or uncontroverted? Sorry, uncontroverted. Uncontroverted. Do you mean that the commission has to believe uncontradicted testimony, or can they say we don't believe it, especially when they see a surveillance video that shows him doing all sorts of stuff like gardening and other things, they could turn around and say we don't believe it. Well, first of all, I think you're complaining. I hear you have many different issues here. Excuse me. Yes. One thing you do when the court is talking, you don't talk. All right? That's my basic rule of argument. You'll have five minutes in reply. Thank you. Melissa McKendry for the defendant in this case, T.J. Maitland, three-modeling. We got through most of the facts. I'm assuming you don't want any more questions. Well, why don't you just address these last points, the opposing counsel, because that seems to be right at the crux of her argument and I think needs to be addressed. The repetitive trimination of the death. Well, that and the other causal connections that she suggests have been made and that there's error here in the decision because they were ignored. I don't think they were ignored. It's a very thoughtful, well-written decision. And the standard in the court. Well, what about that neck injury, the findings of fact and conclusions of law? I said, well, that's not even after reading her private reply brief, looking into that. And in my original brief, I indicated there was a written request, but the X on the stipulation sheet was her written request. At the time, that's a 19B, it said, written decision including findings of fact and conclusions of law is requested pursuant to Section 18. So that was enough. But the issue wasn't each body part. The issue was causation along with medical and TTD, and there was about five issues. So it's the defendant's argument that the neck did not have to be specifically addressed. Causation had to be addressed, and it was. The judge looked at everything from the June 3, 2013 accident and found that the shoulder was causally related. So he answered the issue in detail on the findings and conclusions of law for that causal connection to the shoulder. And then it's the defendant's argument that he didn't need to go further to say what wasn't included, although he probably should, and it would be nice if he did. He added to the five other body parts that weren't included, both hands, the feet, the back. He didn't mention the neck. Originally, and I don't know if this had anything to do with it, the neck was not claimed. The neck was an unamended act seven months later, which is not really that long in a case that was going to proceed on for a couple of years, but it was amended. And I don't know if that's why he missed it. And I would argue that it's harmless clerical error if he did miss it, because he addressed the neck in the statement of facts, his statement of his understanding of the medical and his understanding of the testimony. And he left it out. And I don't think it can be reversed to say now it needs to be an accepted injury because he left it out. He went to the judge. Let me ask you a pointed question. The central theme of our argument, one of the central themes, is, look, the claimant testified candidly and credibly about the nature and extent of his injuries. He seems to be saying, at least, that there really is scant evidence on the other side to contest this. The medical evidence really doesn't contradict the claimant's testimony. So what do you have to say to that? Well, many times we're in that situation where we have an unwitnessed accident and the credibility of the petitioner has to... But what evidence contradicts his testimony? Contradicts the testimony about the incident of trauma? No, the claimant's testimony. Yeah, right. Well, he testified one way, but that same information was not provided to Dr. Chatty in the deposition or Dr. McNally in his deposition. So the testimony and the medical evidence is not coherent, and they were not looking at the same facts. Usually there's a hypothetical that's very detailed, and the testimony is consistent with that statement. So is your argument that you're categorizing this as a failure of proof, basically? I'm saying that they didn't reach the proof right. And that is why? What? And that is why it was lacking in their evidence? Well, according to the arbitrator decision accepted by the commission, it was in detail to the frequency, how often he used the tools, and even today she's talking about a one-day situation where he was hammering, had the latter incident, and was hammering some more. Repetitive trauma rarely is just a one-day, although it can be, it rarely is just one day of the repetitive activity. So I think if there was a broader spectrum of his activities, how often he used the vibrator tools, how often he hammered, how often he lifted, I think it would have been potentially a different conclusion by the commission. But it was lacking in the medical support by Dr. Chatty in his evidence deposition. And I think... Now, Chatty, you would suggest, is supportive of compensation, right? Or what was his conclusion? He was supportive that the shoulder was completely relayed. And at that time, we were disputing accident that had happened on a credibility issue, and we did not prevail on that argument. And that was much of what our focus was on at the entire time of this case, was that based on the fact that Dr. Quinn was not rescheduling, we just had a lot of issues with that, and that he didn't... It's not an issue, but there was some delay in the detail of the accident, not just that he hurt himself at work generally, but in detail. So the case was fought until the day of trial based on the accident. So I think Chatty was trying to really focus on that that pain on that ladder caused the shoulder injury. I don't think he... I don't think as a... In his testimony, he was less concerned about the repetitive trauma aspect because he was most concerned about that shoulder, and that it was causally related to this accident. For you, there may be other issues, or maybe it's your time. So there was four arguments in this case. We discussed the first one regarding the fact that the arbitrator in the commission did not discuss the neck, but I believe that that is... Well, the arbitrator did discuss the neck. Oh, he didn't list it as the findings. Yeah, he talked about Dr. Bernstein's opinion, and that he was the IME related to the neck and low back, and that he found that Petitioner most suffered strains to the cervical and lumbar spine, and he had no permanent injury to either the neck or the low back, and he opined that the Petitioner was at MMI for the neck and low back injury. So he did discuss it. For the first accident as far as the finding, but he did address it as a repetitive trauma accident that was related to that, which is from July 25th, 2013. For the repetitive nature arguments for Sections 2 and 3, it's the defendant's argument that there was... His artist's burden of... There's enough evidence there that the commission could find in favor of the defendant that there was no causal connection from a repetitive trauma basis, and we still argue that it's a manifest weight of the evidence. But for the fourth argument, which in my brief I talked a little bit about TTD when I should have talked a little bit more about the medical, the reason that... The question is whether additional medical should have been authorized. Dr. Baer was not an IME. He was a second opinion. He was no an IME. The medical bill was not entered into evidence until afterwards to kind of help prove that that wasn't an IME. But he was just a second opinion, and he found that the petitioner was an MMI but needed an FCE. And he did not have the video surveillance that we submitted at trial. And as you know, we put everything together on a highlight reel and submitted that into evidence. So when the commission reviewed that, they decided that that last bit of recommendation for the FCE was no longer necessary. That he was MMI. So Dr. Baer found MMI. Surgery was not recommended by him or Dr. Nicholson, even though Dr. Chadia thought maybe a second surgery would be helpful. Dr. Nicholson said no. He did not release him to work because he was still under conditioning at the time of that examination. Dr. Baer saw him after he was done with therapy and decided that he did not need any more treatment. Surgery wouldn't help. So the commission relied on that opinion, and the additional medical opinion referred to is that FCE, that looking at the surveillance video that Dr. Baer did not see, they decided he could work for them based on their viewing of that surveillance. So no further questions? I don't believe there are. Thank you, counsel. Thanks. You have five minutes in reply. Okay. There are a few points I'd like to address. First of all, I'd like to start out where in a way she kind of started, which is let's talk about what the fight was over. Because it was over the shoulder, you'll see in the evidence, they paid TTD on a disputed basis because they thought, how can you fight that a construction worker did a carpenter and so they paid it on a disputed basis from the date of Trevor's first carpal tunnel surgery through Dr. Baer's report, and that's when they cut off TTD because they knew he worked in construction. What does that mean, the fact that they paid TTD reasonably? On a disputed basis? Because they thought they were going to get dinged on that. The real fight was over the shoulder because they knew he worked in construction. He testified. Maybe they paid TTD because they didn't want to face a sanction petition at the end. Well, they cut it off based on Dr. Baer's report and they started paying on the date of the first surgery, so they paid for the period of the carpal tunnel. That has no evidentiary value in a case. Well, what it goes to show is that it was really common knowledge that he worked in construction. That's what he testified to. He testified that I worked physical labor. I asked him specifically, is your job managerial or is it physical? He said I worked physical labor. This is one of the errors of the commission, which is that they invent terms. First of all, you see nowhere in the testimony of the transcript that he testified that he is a construction supervisor, and this term, construction supervisor, is what the commission found him to be, and he does not testify to that. That word is not anywhere in his testimony. It's invented. It's invented that his job was supervisory. That is not the evidence. The evidence is to the contrary, and the defendant brought in no one to testify. Otherwise, it's uncontroverted he worked a manual, physical, heavy-duty job. Second of all, I was about to address the surveillance when my time was over, but they did 17 days of surveillance on him. On the 13th day of surveillance, which is months after he's in physical therapy and in treatment, that is when they see him doing the guarding project, when he's already doing that kind of work in physical therapy. He's already lifting 45 pounds. He's already bicycling. He can lift up to 60 pounds in physical therapy. There's nothing in that surveillance, which is inconsistent with the activities that he's doing and with Dr. Bernstein's recommendation, which is he should engage in physical labor. You don't see anywhere, anywhere in that surveillance video that he's lifting overhead with his left arm. That is the issue. That's a problem he's having. He can't lift overhead work with the left arm. So the fact that he can do something and the fact that he can lift consistently, what we know he can do in physical therapy based on the records, I think is a total red herring. Yes. He was not. What he did is, if you look at the video, and I suggest you look at the video, he takes a bath and he lifts it like this on his right arm. That is Russian. And he did it like this. And the testimony he said before where he had hay on rafters like a monkey, that is very different. And this is actually what he had said to the circuit court. I have a viral. I can no longer lift my thigh or leg like this when he was a kid, but I can take my bicycle and I can lift it on a hook. Now, are you going to tell me I can do construction work because I can lift my bicycle on a hook? It's very different. The kind of work he's doing on the video is the same thing he's doing in physical therapy, so lifting like a 20-pound bag of dirt, which is the heaviest thing you've seen him doing. And this is, again, after 13 days of surveillance. He did a total of 17 days. The construction, not construction, the potting in his yard is the end of April, which is lighter than what he's doing already in physical. Can I ask you a question? You received an award for the left shoulder, did you not? Yes, I did. And you got TTD for 43 and 5-7 weeks for a left shoulder. Correct. So why are we talking about the left shoulder? Well, because of medical, because medical's an issue, because they said Charm's not entitled to any additional medical care. And that comes to my last point, which is Dr. Nicholson. She's talking about Dr. Nicholson didn't recommend surgery. Well, at the time, Dr. Nicholson saw him for the second time. I don't think the surgery was recommended yet. It wasn't recommended because Trevor was still under treatment. He was in the middle of his either the end of physical therapy, just about to start the work conditioning. So Dr. Nicholson did see him when the surgery part was recommended. Dr. Nicholson saw him when he's on his way returning to work, and they think he's, you know, gearing him up to go back to work. So Dr. Nicholson doesn't opine about getting the second surgery because that issue wasn't brought to his attention. Also, I don't think Dr. Nicholson was aware of that other, the second MRI which showed he had new tears in his left shoulder. So I contend that it's irrelevant that Dr. Nicholson didn't opine as to a second surgery because it wasn't brought to his attention. So I believe that Trevor is entitled to additional medical care because this was a 19-B. It would be issued with causal connection. I do think that the causal connection was established based on the medical testimony, coupled with Trevor's uncontroverted testimony that his job was physical, manual labor. And I feel that the commission failed to follow the law, which is why I believe based on also the arguments in suit that if the raw laws apply to fats, it's a de novo review, which is why I asked for a de novo review. I think it's very clear also that he hurt his back on the day of the accident. That is a manifest way because that is a question of fat. I think the commission was flat out wrong. And thank you very much. Thank you, counsel. Have a great day. Thank you, counsel, both, for your arguments in this matter. It will be taken under advisement and written disposition shall issue.